IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MANUEL M. LICHAUCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 4624 |
| v. | ) | |
| | ) | Magistrate Judge |
| KIRSTJEN NIELSEN, Secretary, | ) | Maria Valdez |
| United States Department of | ) | |
| Homeland Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Manuel M. Lichauco filed this employment discrimination suit against the Transportation Security Administration ("TSA") alleging disparate treatment based on his race and national origin and retaliation for engaging in protected activity, *i.e.*, filing Equal Employment Opportunity ("EEO") complaints. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the Court on Defendant's Motion for Summary Judgment [Doc. No. 32]. For the reasons that follow, the motion is granted in part and denied in part as to a claim not contained in the Second Amended Complaint.

---

[1] Defendant Kirstjen Nielsen is substituted for her predecessor pursuant to Federal Rule of Civil Procedure 25(d). She is sued in her official capacity as Secretary of the Department of Homeland Security. (LR 56.1(a)(3) ¶ 2.)

## **FACTS**[2]

Plaintiff is a transportation security officer employed by the TSA at O'Hare Airport. (LR 56.1(a)(3) ¶ 2.) He is an Asian of Filipino descent.[3] (LR 56.1(b)(3)(C) ¶ 1.) Plaintiff was originally hired by the TSA in 2004 and worked as a transportation security officer, with the duty of screening passengers, from 2004-2008. He was then promoted to be a Master Coordination Center Officer ("MCCO"), whose duties were to collect information about ongoing incidents at O'Hare and to report this information to TSA leadership. (LR 56.1(a)(3) ¶ 3; LR 56.1(b)(3)(C) ¶ 1.)

The coordination center plays a vital role in incident communications at O'Hare and is involved in all incidents pertaining to security operations. The coordination center is responsible for coordinating response activities by numerous agencies, including the FBI, DEA, CBP, and CPD, as well as by TSA employees, airlines, and TSA headquarters. TSA officers in the coordination center must be concise, factual, and clear when they convey information to other entities. (LR 56.1(a)(3) ¶ 32.) At some point shortly before 2014, Plaintiff's position in the coordination center required more work and report writing than it had previously. (*Id.* ¶ 52.) The TSA provided Plaintiff with classes to assist him in improving his English speaking and writing, including online and in person off-site classes paid

---

[2] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces. The facts are stated in the light most favorable to Plaintiff. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).

[3] Plaintiff's statement of facts alleges he is Asian, but his response brief states that he is Hispanic. (*See* Pl.'s Resp. at 1-2, 8, 10-12.) Because the undisputed fact overrides argument of counsel, the Court finds Plaintiff's self-description controlling.

for by the TSA. (*Id.* ¶ 31.) Plaintiff disagreed that he had any issues with his speech. (LR 56.1(b)(3)(B) ¶ 31.) Starting in 2013, Plaintiff received increased criticism and discipline for his work, and he filed EEO complaints in February 2014 and December 2014 claiming that the criticism and other instances of alleged workplace harassment were discriminatory.

In February 2014, Plaintiff made an administrative EEO complaint,[4] which the TSA accepted for investigation, raising four issues: (1) on October 30, 2013, the Supervisory Coordination Center Officer ("SCCO") Loren Becht issued Plaintiff a Letter of Guidance ("LOG"); (2) on the same day, SCCO Becht gave Plaintiff a performance review that was less favorable than the prior year's; (3) on November 2, 2013, a Master CCO ("MCCO2") mocked Plaintiff's accent, and when Plaintiff reported the incident to the SCCO, he responded, "So, what do you want me to do?"; and (4) on November 4, 2013, the same MCCO2 called Plaintiff obnoxious. (*Id.* ¶ 5.)

The second EEO complaint, made in December 2014, raised six additional issues, and two more issues were added after Plaintiff's April 29, 2015 written request to do so. The eight total issues are as follows: (1) on or around October 3, 2014, management denied Plaintiff seniority ranking during the vacation leave bid process; (2) on or around October 3, 2014, management denied Plaintiff's request for vacation leave from February 14, 2015 to February 18, 2015; (3) on or around October 14, 2014, the Coordination Center Manager ("CCM") lowered Plaintiff's 2014 performance rating from 4.1 to 3.3; (4) on November 5, 2014, the SCCO issued

---

[4] Plaintiff had also filed an EEO complaint in 2009 against supervisors Loren Becht and Brian Lucas, alleging harassment and retaliation based on race and national origin. (LR 56.1(b)(3)(C) ¶ 2.) The issues raised in the 2009 complaint are not before the Court.

3

Plaintiff a LOG for typographical and grammatical errors in Plaintiff's correspondence; (5) on November 24, 2014, the CCM yelled at Plaintiff, telling him to "get the hell out of my office"; (6) on or around December 17, 2014, the SCCO issued Plaintiff a Notification of Unacceptable Performance and assigned him to a Performance Improvement Period ("PIP"); (7) on January 29, 2015, management extended the December 17 PIP an additional 90 days; and (8) on April 29, 2015, management issued Plaintiff a Notice of Proposed Removal. (*Id.* ¶ 6.) Each of the issues raised in the two EEO complaints will be discussed more fully in turn.

The October 30, 2013 LOG was issued as a result of Plaintiff improperly responding to a request to update a significant activity report ("SAR") with a particular flight's departure time. The LOG states that is was "not a formal disciplinary action." (*Id.* ¶¶ 7-8.) In his response to Defendant's Statement of Facts, Plaintiff argues that the mistake did not warrant a LOG, because other officers made the same error, and he was not properly trained. (LR 56.1(b)(3)(B) ¶ 7.) The response does not dispute that the mistake was made. (*See also* LR 56.1(a)(3) ¶ 9.) According to Plaintiff, his error was caused by a lack of policy guidance and being given improper information by another employee, Paul Roland. (LR 56.1(b)(3)(C) ¶ 4.) Plaintiff alleges the LOG was discriminatory because he is the only Filipino MCCO, Brecht is German, and Roland is African-American. (*Id.* ¶ 5.) Plaintiff also believes the LOG was issued because Brecht and Lucas did not like his Filipino accent and his prior EEO complaints against them. (*Id.* ¶ 7.)

Plaintiff's October 30, 2013 overall performance review rating was 4.1 out of 5 for the year, which "exceeds expectations." (LR 56.1(a)(3) ¶¶ 10-11.) His 3.0 rating in the category Communications and Customer Service declined from the previous rating period, but the overall rating was higher than the 4.0 he received the year before. (*Id.* ¶¶ 10-11; LR 56.1(b)(3)(B) ¶ 10.) Plaintiff claims his lowered performance rating could affect bonuses and pay increases. (LR 56.1(b)(3)(C) ¶ 6.)

In the November 2, 2013 incident, two of Plaintiff's coworkers, including Devon DeJesus, were sitting behind him and talking. DeJesus called Plaintiff's name, and when he turned around, she made fun of his accent and the way he pronounced a particular word. (LR 56.1(a)(3) ¶ 12; LR 56.1(b)(3)(B) ¶ 12.) Becht, the SCCO, did not personally witness the incident but heard a commotion and walked into the coordination center office where Plaintiff and DeJesus were present. The parties dispute whether DeJesus apologized to Plaintiff. (LR 56.1(a)(3) ¶ 13; LR 56.1(b)(3)(B) ¶ 13.) After discussing the incident with Plaintiff further, Becht told him "What do you want me to do?" Plaintiff then became upset and got CDM Ralph Schumacher[5] from his office to assist; Schumacher said nothing and left. (LR 56.1(a)(3) ¶¶ 13-14; LR 56.1(b)(3)(B) ¶¶ 13-14.) Two days later, DeJesus asked Plaintiff to help her with an incident report. Plaintiff refused, saying, "No, I am doing the ham radio." Plaintiff went to the bathroom twice, and when he went the second time, DeJesus stated, "Manny, you're obnoxious." (LR 56.1(a)(3) ¶ 15.) According to Plaintiff, DeJesus has called him obnoxious many times, but no one

---

[5] Plaintiff fails to identify the meaning of the acronym "CDM", but presumably Schumacher's position was above that of SCCO Brecht.

who has witnessed it has ever stopped her. (LR 56.1(b)(3)(B) ¶ 15.) Plaintiff did admit, however, that DeJesus did not harass him after the November 2, 2013 incident. (LR 56.1(a) ¶ 8.)

Plaintiff's next round of complaints began in October 2014, when he did not receive his first choice of vacation time. (LR 56.1(a)(3) ¶ 16.) Plaintiff requested leave from February 14 through February 18, 2015 but was granted leave only on February 14. (LR 56.1(b)(3)(C) ¶ 9.) Plaintiff was told by Lucas that seniority for purposes of vacation preference was calculated using "entry-on-duty" dates, *i.e.*, the date that employees started in their current position in the coordination center, which in Plaintiff's case was 2008. Plaintiff disagreed, believing that the correct seniority calculation should use the start date of TSA employment, which for Plaintiff was 2004. (LR 56.1(a)(3) ¶ 16; LR 56.1(b)(3)(B) ¶ 16.) This method was in contrast to that for shift bids, which calculated seniority by start date. (LR 56.1(a)(3) ¶ 18.) Lucas told Plaintiff that he could do what he wanted because he was a policy maker. (LR 56.1(b)(3)(C) ¶ 9.)

While Plaintiff's statement of facts is not entirely clear, it appears that Plaintiff believes that the entry-on-duty date applied only to traditional leave requests and not the bid process, and Lucas was in violation of TSA policy. (LR 56.1(b)(3)(C) ¶ 9; LR 56.1(b)(3)(B) ¶¶ 16-18.) Lucas testified that in 2014, the same seniority calculation was used for all employees, and he met with Plaintiff several times to explain seniority calculation for scheduling leave. (LR 56.1(a)(3) ¶¶ 17-18.) Lucas also asked Administrative Officer Melvin Erdman to explain the seniority

rules to Plaintiff. Erdman later wrote Plaintiff an email explaining that his seniority had been correctly calculated, and he was treated the same as other employees. (*Id.* ¶ 19.) On November 24, 2014, Plaintiff requested leave on February 14 through 18. Defendant does not dispute Plaintiff's account that Lucas yelled, "Get the hell out of my office and do not come back about seniority or requesting your vacation!" (*Id.* ¶ 20.) Lucas then followed Plaintiff out of his office and continued to yell at him in front of other employees. (LR 56.1(b)(3)(C) ¶ 12.)

Plaintiff's October 2014 performance review was lower than his 2013 evaluation, with a rating of 3.36, or "achieved expectations." (LR 56.1(a)(3) ¶ 22.) SCCO Becht testified that Plaintiff needed to improve his ability to acquire and communicate relevant information; that his written work contained mistakes; and that although he spoke to Plaintiff about his writing on multiple occasions, he continued to make the same mistakes and became upset when Becht spoke to him about improving his writing skills. (*Id.* ¶ 22.) Plaintiff disagreed with the evaluation and asked why his performance ratings decreased so fast in a two-year period. He claims that Becht laughed at this, and Plaintiff refused to sign his performance review. (LR 56.1(b)(3)(B) ¶ 22.) Plaintiff believes that his decreased performance review was the result of his race and accent. (LR 56.1(b)(3)(C) ¶ 10.)

The November 2014 LOG issued by SCCO Becht gave examples of six mistakes that Plaintiff allegedly made between October 1 and November 2, 2014. (LR 56.1(a)(3) ¶ 23.) Plaintiff disagreed with Becht's findings and analysis and did not sign this LOG. (LR 56.1(b)(3)(B) ¶ 23.) Plaintiff contends that the LOG was

issued solely for typographical or grammatical errors, and other MCCOs did not receive LOGs for such errors. (LR 56.1(b)(3)(C) ¶ 11.)

On December 17, 2014, Becht issued to Plaintiff a written notification of unacceptable performance in multitasking, decisionmaking, and communications, and establishing a ninety-day PIP during which Plaintiff was expected to improve his performance. (LR 56.1(a)(3) ¶ 24.) According to Plaintiff, the work examples leading to the PIP were misrepresented, and during the PIP Becht never met with him or gave him suggestions to improve his skills. (LR 56.1(b)(3)(C) ¶¶ 13, 15; LR 56.1(b)(3)(B) ¶¶ 24, 26.) On January 29, 2015, the second shift supervisor, Michael Mongoven, notified Plaintiff that his performance remained unacceptable, and he extended the PIP for an additional ninety days. (LR 56.1(a)(3) ¶ 25.) Plaintiff testified that Mongoven stated that Lucas told him to micromanage Plaintiff. (LR 56.1(b)(3)(C) ¶ 14.)

Plaintiff's manager, Lucas, issued to Plaintiff a Notice of Proposed Removal on April 29, 2015. (LR 56.1(a)(3) ¶ 26.) The notice gave examples of instances during the PIP in which Lucas determined that Plaintiff had failed to meet the critical elements of core competencies in his performance plan, namely multitasking, decisionmaking, and communications. (*Id.* ¶ 26; LR 56.1(b)(3)(C) ¶ 16.) Plaintiff provided a written response dated June 3, 2015. (LR 56.1(a)(3) ¶ 26.) Plaintiff complains that the notice listed sixteen dates on which Becht and Mongoven reviewed his performance and provided feedback to him, but that no PIP meetings took place on those or any other dates. (LR 56.1(b)(3)(C) ¶ 15; LR 56.1(b)(3)(B) ¶ 26.)

8

The deciding official with respect to the Notice of Proposed Removal was Peter Adamson, the Assistant Federal Security Director at O'Hare. He had no direct supervision or oversight of the coordination center and had not been involved in any events leading up to Plaintiff's proposed removal. (LR 56.1(a)(3) ¶ 27.) On June 18, 2015, Adamson issued a decision letter in which he explained that he had considered the Notice, Plaintiff's response, and all of the evidence of record, and he declined to implement the proposed removal. Adamson instead demoted Plaintiff from his position in the coordination center to his prior position as a transportation security officer screening passengers. (*Id.* ¶¶ 28-29.) Adamson's decision letter concluded that Plaintiff had made numerous errors in his reports that had to be corrected by his supervisors and coworkers; Plaintiff acknowledged that his work contained mistakes; and Plaintiff had failed to substantiate his claim of unfair treatment. (*Id.* ¶ 30.)

Adamson testified about several examples of unsatisfactory work and mistakes Plaintiff made, resulting in time wasted by Plaintiff's supervisors, co-workers, and/or TSA headquarters. (*Id.* ¶¶ 33-49.) According to Adamson, the errors led to a conclusion that Plaintiff was not satisfactorily performing his duties as an MCCO, and that his performance remained unacceptable during the PIP. (*Id.* ¶¶ 50-51.) Plaintiff admits that many of the cited errors were made but disputes

Adamson's conclusions that the mistakes were his fault.[6] (LR 56.1(b)(3)(B) ¶¶ 33-49.)

Adamson ultimately decided not to remove Plaintiff but instead to demote him to his prior position as a transportation security officer after considering (1) his employment history since 2004 with performance at the satisfactory level and often higher until 2015; (2) the fact that his coordination center position had recently required a higher volume of work and additional report writing; and (3) that Plaintiff and his family had been experiencing stress from his work. (LR 56.1(a)(3) ¶ 52.)

On January 28, 2016, the TSA issued a final agency decision rejecting the allegations in his February 2014 EEO complaint, finding that he had failed to present evidence that the alleged actions were taken against him based on his race, national origin, or EEO activity, and his December 2014 complaint was rejected on October 6, 2016. (*Id.* ¶ 54.)

Plaintiff filed the present suit on April 25, 2016, within ninety days of the decision on the first EEO complaint. On November 25, 2016, within ninety days of the second agency decision, Plaintiff amended his complaint to include the

---

[6] Plaintiff's responses to the instances of errors described by Adamson are extraordinarily unclear. They are filled with jargon, undefined acronyms, names of employees whose relevance to Plaintiff's claims is unknown, and shorthand descriptions of work procedures that are meaningless to an outsider. (*See, e.g.,* LR 56.1(b)(3)(B) ¶ 34.) More outrageously, the responses often shift from third person to second person, because they are in large part copied directly from Plaintiff's declaration without being cast in a light appropriate for a Local Rule 56.1 statement. (*See id.*) ("[W]e were working on the same person . . . and when Lic[h]auco was talking . . . ."). The declaration was also directly copied into Plaintiff's brief at several points, even resulting in the unexpected use of the first person in the narrative description of the facts. (*See* Pl.'s Resp. at 5.)

additional issued raised in his second EEO complaint. (*Id.* ¶ 56.) Plaintiff's demotion to transportation security officer was not one of the issues raised in either of his complaints, accepted for investigation, or addressed in either final agency decision. (*Id.* ¶ 55.)

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual

dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted); *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002) ("Conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

"[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson*, 325 F.3d at 901 (citation and internal quotations omitted). "In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II. ANALYSIS

Defendant argues that summary judgment should be granted because: (1) Plaintiff failed to administratively exhaust his claim that he was reassigned because of his race and national origin; (2) the other events Plaintiff complains of

are not adverse employment actions; and (3) Plaintiff has offered no evidence of similarly situated individuals or pretext.

The governing legal standard for Plaintiff's discrimination claim is whether the evidence as a whole would allow a reasonable factfinder to conclude that Defendant created a hostile work environment and/or retaliated against Plaintiff based on his race, national origin, or protected activity. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (clarifying that it is improper to analyze disparate treatment cases under separate "direct" and "indirect" methods of proof). *Ortiz*, however, did not dispense with the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766. Accordingly, to establish a prima facie case of discrimination, Plaintiff must show: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *See Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007).

Once a plaintiff makes out a prima facie case of discrimination, the burden then shifts to the defendant to produce "a legitimate, noninvidious reason for its actions." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 635 (7th Cir. 2009). If the defendant is able to provide a reason rebutting the presumption of discrimination, the burden shifts back to the plaintiff to demonstrate that the proffered reasons "are false and only a pretext for discrimination." *Id.* (internal quotation and citation omitted).

13

### A. Reassignment

Defendant argues that with respect to a claim for unlawful reassignment, Plaintiff failed to exhaust his administrative remedies, which is a prerequisite to filing a lawsuit under Title VII. *See Brown v. Gen'l Servs. Admin.*, 425 U.S. 820, 832 (1976). While it is true that Plaintiff has not alleged or proved exhaustion, he also has not alleged that the reassignment was discriminatory. The wrongful acts alleged in the Second Amended Complaint end with the April 29, 2015 issuance of the Notice of Proposed Removal, which was included in Plaintiff's second EEO complaint. Defendant's motion for summary judgment on the reassignment claim must be denied, as that claim does not exist in the complaint.

### B. Adverse Employment Actions

Defendant next contends that Plaintiff has not made out a prima facie case with respect to issues raised in his two EEO complaints. Specifically, Defendant argues that Plaintiff has not alleged any actionable adverse employment actions; Plaintiff has not offered proof of any similarly situated individuals; and Plaintiff has not offered any evidence to counter Defendant's statement of non-pretextual reasons for making the employment actions.

To constitute an adverse employment action, a change "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (citations and internal quotations omitted). "The definition of an adverse employment action is generous,

but it is still subject to certain limitations. . . . At the very least, [a plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson*, 325 F.3d at 901; *see also Davis v. Time Warner Cable of S.E. Wisc., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("'[N]ot everything that makes an employee unhappy is an actionable adverse action.'") (citation omitted).

Plaintiff alleges the following discriminatory actions were taken against him: negative employment evaluations; issuing LOGs enumerating alleged mistakes he made; issuing the Notice of Proposed Removal; denying his preferred vacation dates; and placing him on a PIP. The Court agrees with Defendant that Plaintiff has failed to demonstrate any of these allegedly discriminatory acts constitute adverse employment actions.

Negative employment evaluations are not, by themselves, adverse employment actions. *Smart v. Ball State Univ.*, 89 F.3d 427, 442 (7th Cir. 1996) (holding that evaluations "were facially neutral tools designed to identify strengths and weaknesses in order to further the learning process"); *see also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) ("If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit."). Moreover, as Defendant points out, Plaintiff's evaluations were not even negative – they simply were less positive than they had been in previous years.

Similarly, the issuance of LOGs was not materially adverse to Plaintiff's employment. Letters of instruction or counseling statements admonishing an employee to improve are not considered adverse employment actions unless the employee can show "immediate consequences of the reprimands, such as an eligibility for promotion, transfer to a favorable location, and advantageous increase in responsibilities or similar benefits." *Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008); *see also Sweeney*, 149 F.3d at 556 ("At most [the plaintiff] has documented instances in which [he] was unfairly reprimanded for conduct [he] either did not engage in or should not have been responsible for. Absent some tangible job consequence accompanying those reprimands, we decline to broaden the definition of adverse employment action to include them.").

The Notice of Proposed Removal was not, by itself, an adverse employment action, because its issuance did not materially change the terms and conditions of Plaintiff's employment. Failing to award Plaintiff his first choice of vacation days is clearly not a qualitative change in the terms or conditions of his employment. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Placing Plaintiff on a PIP also does not rise to the level of an adverse employment action. *Bagwe*, 811 F.3d at 889; *Davis*, 651 F.3d at 677.

### C. **PIP**

Because a PIP can constitute relevant evidence of retaliation in some circumstances, the Court will go on to consider whether it was discriminatory in Plaintiff's case. *See Bagwe*, 811 F.3d at 889. The Court concludes that Plaintiff has

not met his burden of establishing a prima facie case of discrimination based on the PIP, nor has he demonstrated that Defendant's reasons for placing him on the PIP were pretextual.

First, Plaintiff has not shown that he was treated differently than similarly situated non-Filipino employees, and therefore he has not made a prima facie showing of discrimination. When offering another employee as similarly situated, "'a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects.'" *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002)). Similarly situated employees should have the same or comparable job title, education, experience, and seniority; perform the same types of tasks; be subordinate to the same supervisor; and have a "'comparable set of failings.'" *Id.* (quoting *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)); *see Cracco*, 559 F.3d at 635; *see also Brady v. Boehringer Ingelheim Pharms., Inc.*, No. 05 C 5934, 2008 WL 4425445, at *7 (N.D. Ill. Sept. 26, 2008) (holding that plaintiff's failure to offer comparators with the same performance problems "doom[ed]" her discrimination claim). Plaintiff's statement of facts contains a laundry list of names of co-workers whom Plaintiff "did not believe" received LOGs despite also making typographical and grammatical errors. (LR 56.1 (b)(3)(C) ¶ 11.) But Plaintiff has offered no admissible evidence that any other employees made the same mistakes he made, and if they had, what steps Defendant took in response. *Atanus*, 520 F.3d at 675 (holding that a plaintiff failed to establish a prima facie case of

discrimination where she submitted no evidence that employees receiving less severe letters of instruction had been repeatedly reprimanded as the plaintiff had).

Second, even if Plaintiff did make a prima facie showing, he has not put forth any evidence suggesting that Defendant's stated reasons for placing him on the PIP were pretextual. *See Sweeney*, 149 F.3d at 557 ("[T]he question is not whether the employer's reasons for a decision are 'right but whether the employer's description of its reasons is *honest*.'") (citation omitted, emphasis in original); *see also Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) ("[T]he court is not a 'super-personnel department' intervening whenever an employee feels he is being treated unjustly."). Defendant argues that the PIP, along with the LOGs and evaluations, were all necessary means of addressing Plaintiff's mistakes and performance deficiencies, and Plaintiff does not demonstrate that Defendant's belief was not honestly held. Indeed, Plaintiff's response to the summary judgment motion contains no factual argument whatsoever. And in his response to Defendant's statement of facts, Plaintiff disagrees with Defendant's characterization of the errors he made, but he does not dispute that he made errors before the PIP and continued to make mistakes during the duration of the PIP. Plaintiff only offers his subjective belief that he mistakes were not his fault but rather the result of improper training and/or that they were the types of mistakes made by others who were not reprimanded. Plaintiff's belief about the cause of the mistakes, however, does not create a triable issue of fact as to the truth of Defendant's non-retaliatory motive for placing him on the PIP.

### D. <u>Hostile Work Environment</u>

The disparate treatment counts in Plaintiff's Second Amended Complaint also allege that Defendant's actions "created a racial and offensive work environment." (*See, e.g.,* 2d Am. Compl. ¶ 9.) In order to prove this claim, Plaintiff must show that (1) he was subjected to unwelcome harassment in the workplace; (2) the harassment was based on his race, national origin, or protected activity; (3) the harassment created a "hostile and abusive working environment," *i.e.*, it was so severe and pervasive that it altered the conditions of his employment; and (4) Defendant is liable for the harassment. *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863 (7th Cir. 2005).

Plaintiff gives the following concrete examples of alleged harassment: his supervisor Lucas yelling at him and generally being hostile towards him, and his co-worker DeJesus mocking his accent and calling him obnoxious. While unprofessional, these actions are not sufficient to show a hostile work environment. "General hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive." *Griffin*, 356 F.3d at 829. Even Plaintiff characterizes his employment situation as merely "uncomfortable," (Pl.'s Resp. at 14), which fails to meet the standard. *See Griffin*, 356 F.3d at 829 (explaining that an "unpleasant" environment is not severe enough to be actionable). Furthermore, Plaintiff has offered no facts establishing Defendant's liability for DeJesus's comments. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). Although he claims DeJesus made fun of him on numerous occasions,

Plaintiff admits that she stopped harassing him after he reported it to management, despite his unsupported assertion that his superiors did nothing about her behavior.

Plaintiff has failed to present any issue of material fact by which a reasonable jury could find he suffered an adverse employment action, he was treated differently than other similarly situated employees, or that Defendant's stated reasons for its actions were pretextual.[7] Accordingly, summary judgment must be granted.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 32] is granted in part and denied in part as to a claim not contained in the Second Amended Complaint.

**SO ORDERED.**  **ENTERED:**

**DATE:   February 26, 2018**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**

---

[7] On February 16, 2018, Plaintiff filed a Motion for Leave to File Third Amended Complaint or in the Alternative for Entry of an Order Expressly Reserving Plaintiff's Right to Maintain Those Claims in Another Action [Doc. No. 45]. The motion is denied as moot, as the Court's opinion in this case does not implicate the allegations or claims in Plaintiff's later-filed case, *Lichauco v. Kelly*, No. 17 C 7289.